# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **INTERMETAL REBAR, LLC,** | **Case No. 25-2057** |
| **Plaintiff,** | |
| **vs.** | |
| **AVONDALE TERMINAL SERVICES, LLC,** | |
| **Defendant.** | |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, INTERMETAL REBAR, LLC ("Plaintiff"), respectfully alleges, according to the Federal Rules of Civil Procedure, as follows:

## PARTIES

### 1.

Plaintiff is a Florida limited liability company that is and was, at all relevant times hereto, lawfully conducting business in the State of Louisiana. Plaintiff's members are all domiciled and thus retain citizenship in the State of Florida.

### 2.

Defendant, AVONDALE TERMINAL SERVICES, LLC ("Defendant"), is a Delaware limited liability company that is and was, at all relevant times hereto, lawfully conducting business in the State of Louisiana. Upon information and belief, Defendant's members are all domiciled and thus retain citizenship outside of the State of Florida.

## JURISDICTION AND VENUE

3.

The Court has jurisdiction over this matter pursuant to 28 U.S. Code § 1332 because (a) upon information and belief, there is complete diversity between Plaintiff and Defendant, as described above, and (b) the amount in controversy exceeds $75,000.00, exclusive of interests, attorney fees, and costs.

4.

Venue is appropriate in the Eastern District of Louisiana, pursuant to 28 U.S.C. 1391 § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims against Defendant occurred in this judicial district.

## FACTUAL BACKGROUND

5.

Plaintiff is a rebar business which sells, supplies, and delivers steel rebar to its customers.

6.

To deliver rebar to customers, Plaintiff has rebar transported by vessel from various source locations to seaports around the United States. Once Plaintiff's shipment of rebar arrives at its seaport destination, Plaintiff often contracts with third party stevedoring services to unload the vessel, store the rebar for pickup, and load the rebar onto Plaintiff's delivery trucks.

7.

On or around February 8, 2025, Anthony Cleveland ("*Cleveland*"), a Commercial Director for T. Parker Host, LLC, who upon information and belief is the parent and/or affiliated entity of Defendant, delivered to Chris Motley ("*Motley*"), Plaintiff's sales manager, the 2025 Term Sheet

(the "*January Term Sheet*") applicable to stevedoring services provided by Defendant for the "contract term" of January 1, 2025 to December 31, 2025 (the "*Contract Term*").

8.

The January Term Sheet provided, among other things:

    a) Service charges for "Free Out Vessel *discharging to [port] barge including dunnage*, lashing, and securing" set at $6.00 per metric ton ("MT") for Wire Rod In Coils ("WRIC") and $9.00 per MT for rebar.

    b) Additional charges included "vessel discharge overtime differential …: $500.00 per gang per hour;" "vessel discharge standby and detention …: $950.00 per gang per hour;" "Holiday surcharge …: $500.00 per terminal hour;" "Barge cover handling: $675.00 per barge;" "Dunnage disposal: $650.00 per dumpster;" Wharfage (if vessel files LOA): $4.89 per MT; and "Security (if vessel files LOA): $0.32 per MT."

9.

The January Term Sheet did not provide for any other charges applicable to services provided by Defendant during the Contract Term.

10.

The January Term Sheet stated that, in addition to the conditions provided under the January Term Sheet, "[a]ll proposals and Services are subject to [Defendant's] Terms and Conditions of Service. Any conflicting terms between (i) the [January Term Sheet] and (ii) [Defendant's] Terms and Conditions of Service, the [January Term Sheet] prevails."

11.

On or around the same time Cleveland delivered the January Term Sheet to Plaintiff, Plaintiff was also provided with Defendant's Terms and Conditions (the "***T&Cs***").

12.

Among other things, the T&Cs provided the following relevant provisions:

a) Section 2: "Application of Terms and Conditions. ***These Terms and Conditions apply to all services provided by [Defendant] to Customer***, irrespective of their nature, ***regardless of whether such services involve operations that would be considered stevedoring operations, terminal operations, warehouse operations or any other kind of operations or provision of services*** under any common understanding or trade usage and regardless of whether any charge is made or paid for such operations or provisions of services. In the absence of any other valid written agreement between Customer and [Defendant] to the contrary, these Terms and Conditions shall be deemed to have been accepted by Customer and shall be binding upon Customer with respect to any services which have been requested by Customer or those acting on its behalf. Any confirmatory action by Customer under the Agreement (as defined below) or ***any acceptance of services or operations from [Defendant] hereunder shall constitute assent to these Terms and Conditions.*** [Defendant] rejects, and shall not be bound by, any term or condition requested by Customer which is different from or in addition to these Terms and Conditions. No terms and conditions set forth herein shall be changed or supplemented without [Defendant's] prior written consent."

b) Section 9: "[Defendant] assumes no liability for ***any loss of or damages to cargo*** handled, stored, or transshipped through its facilities ***except to the extent directly caused by [Defendant's] failure to exercise its duty of reasonable care in the performance of the operations and services.*** [Defendant] assumes no liability for ***inventory discrepancies for any cargo*** handled, stored or transported through its facilities ***except to the extent directly caused by [Defendant's] failure to exercise its duty of reasonable care in the performance of the operations and services.*** Under no circumstances howsoever, shall [Defendant] be liable for Acts of God, inherent vice of the cargo and/or customary trade allowance associated with shortage, shrinkage, wastage, wear and tear etc."

13.

On or around May 2025, Defendant issued a revised term sheet for the same Contract Term (the "***May Term Sheet***"). The May Term Sheet updated the rates for several of Defendant's services and included new terms that were not included in the January Term Sheet.

14.

One new service charge term included the following: "Free out vessel discharge to [port] in storage, and reloading to customer trucks: $16.25."

15.

However, the May Term Sheet did not address any obligation by Plaintiff to pay Defendant's costs of dunnage purchased by Defendant without prior notice or approval by Plaintiff.

16.

On or around June 2025, Plaintiff informed Defendant that it planned to split a large cargo delivery between Defendant's port and a port in Houston.

17.

In response, Defendant encouraged and requested that Plaintiff have its large cargo shipment delivered ***all*** to Defendant's port, representing to Plaintiff that it had the capacity and ability to receive, store, and handle Plaintiff's large shipment without issue.

18.

Relying on Defendant's representation that it had capacity to handle Plaintiff's large cargo shipment, Plaintiff directed its entire shipment to be delivered to Defendant's port.

19.

After delivery of Plaintiff's large cargo shipment, Plaintiff asked Defendant to confirm the number of its trucks it can send to Defendant's facility per day to ensure Defendant's facility was not overwhelmed. Plaintiff communicated to Defendant that it had to pick up all material from Defendant's facility within thirty days, and it needed to plan how many trucks to send per day to meet the deadline.

20.

On June 18, 2025, Defendant's Traffic Manager informed Plaintiff's Vice President of Distribution of Sales that, after reviewing internally, Defendant agreed and was committed to receiving **fifteen** of Plaintiff's trucks per day for pickup of Plaintiff's rebar.

21.

Relying on Defendant's representation that it was committed to receiving fifteen of Plaintiff's trucks per day, Plaintiff organized fifteen trucks per day to Defendant's facility in order to meet its deadline.

### *Truck Dispute*

22.

Despite Defendant's June 18 commitment to receive fifteen of Plaintiff's trucks per day, which was relied upon by Plaintiff in scheduling trucks to pick up rebar and making on-time deliveries of rebar to customers, Defendant soon after back-tracked on its promise.

23.

Although Defendant has represented that it had the capacity and ability to properly receive, store, and handle Plaintiff's large cargo shipment, once Plaintiff's shipment was delivered to Defendant's port, it became readily apparent that Defendant's representations were false.

6

24.

As more thoroughly described *supra*, Defendant was quickly overwhelmed by the size of Plaintiff's cargo shipment, which led to damaged and lost rebar, and extra costs expended by Defendant which Defendant inappropriately charged to Plaintiff.

25.

Due to Defendant's lack of capacity to handle Plaintiff's cargo size, on or around July 2025, Defendant began only accepting ten trucks for pick up of Rebar per day purportedly because fifteen trucks per day was no longer "efficient."

26.

Because Plaintiff planned on sending fifteen of its trucks per day to Defendant's facility, based on Defendant's initial commitment, deliveries to Plaintiff's customers were significantly delayed.

27.

Due to Defendant's breach of its commitment to accept fifteen of Plaintiff's trucks per day for pick up of rebar, Plaintiff has and continues to accrue monetary damages.

### *Dunnage Dispute*

28.

In an email dated June 20, 2025, Cleveland emailed Motley and Joe Carrero ("***Carrero***"), Plaintiff's principal, in which, discussing the rebar being transported by the vessel, "MV Stargazer," Cleveland stated that Defendant already "spent over $50k for dunnage needed for the cargo coming to shore," and inquired whether there is a "reasonable number" in which Plaintiff would be willing to "participate" in that cost, despite the fact that Plaintiff never agreed to share in Defendant's dunnage costs.

7

29.

Neither Motley nor Carrero responded to Cleveland's June 20 inquiry regarding sharing in dunnage costs.

30.

On July 2, 2025, Cleveland again reached out to Motley and Carrero about whether Plaintiff would be "willing to help out" in sharing "half the dunnage cost" with Defendant.

31.

Neither Motley nor Carrero responded to Cleveland's July 2 follow up inquiry regarding the dunnage costs.

32.

Despite Plaintiff having never agreed to share in Defendant's dunnage costs, Defendant included in an invoice issued to Plaintiff dated July 2, 2025 for cargo transported on MV Stargazer (the "***Stargazer Invoice***"), was a $35,373.39 charge for "Additional Dunnage Required Due to Cargo Reallocation" (the "***Dunnage Charge***"), which noted that dunnage cost was "proportionally allocated" to Plaintiff based on Plaintiff being "[r]esponsible for 41.41% of total cargo" on MV Stargazer.

33.

On July 15, 2025, Motley emailed Cleveland asking for Defendant's justification in including the Dunnage Charge, and inquired why dunnage in the MV Stargazer was not re-used.

34.

Cleveland response to Motley's July 15 email referenced his two prior communications asking Plaintiff to share in the dunnage needed for dock cargo, and that that dunnage in MV Stargazer could not be reused because it was "too thin" and could not provide the support needed

to store the rebar. Cleveland claimed that the "dunnage was a real expense and not something that was included. [Defendant is] paying more than half of it."

35.

However, based upon information and belief, Defendant's use of extra dunnage was at least partly due to Defendant being overwhelmed by Plaintiff's large cargo shipment.

36.

On August 1, 2025, Defendants emailed Carrero a letter (the "***Demand Letter***") demanding payment of Plaintiff's "delinquent account," which included the invoice charging the Dunnage Charge.

37.

After receiving the Demand Letter, Plaintiff made a payment for the full balance of the account excluding the disputed Dunnage Charge.

38.

On August 4, 2025, England informed Carrero that, due to nonpayment of the Dunnage Charge, Defendant "has suspended all services for [Intermetal] effectively immediately," and to "notify and instruct [Intermetal] drivers accordingly," which was effectively a threat that Defendant would wrongfully hold Plaintiff's rebar hostage until Plaintiff paid the disputed Dunnage Charge.

39.

Carrero informed England that Plaintiff disputed the Dunnage Charge and that it did not believe it was responsible for the Dunnage Charge.

40.

However, in order to prevent delay in transporting rebar to customers, and to have Defendant release Plaintiff's rebar that was being improperly withheld, Plaintiff paid the Dunnage Charge under protest.

### *Damaged Rebar*

41.

On or around August 4, 2025, a customer reached out to Plaintiff complaining of a delivery of rusted, warped, and severely damaged rebar.

42.

On or around the last week of August 25, 2025, another one of Plaintiff's customers complained that several bundles of rebar were excessively damaged and with possible salt water damage.

43.

On or around the week of September 15, 2025, another customer complained that each bundle of rebar delivered to him, which were held at Defendant's facility, had about twenty-five to thirty pieces of bent or damaged rebar (collectively, with damaged rebar described in paragraph 41 and 42, the "***Damaged Rebar***").

44.

Upon information and belief, Plaintiff suspects that in the coming weeks, additional customers will reach out with complaints of damaged, bent, and warped rebar that were previously held at Defendant's facility.

45.

Upon information and belief, the Damaged Rebar was stored by Defendant while awaiting pick up by one of Plaintiff's truck drivers.

46.

Upon information and belief, the rebar was neglected and damaged while under Defendant's care, such that damage was the direct result of Defendant's negligent handling of Plaintiff's property.

47.

Upon information and belief, Defendant's negligent handling of the rebar was caused in part by Defendant's inability to properly receive, store, and handle Plaintiff's large cargo shipment.

48.

Due to Defendant's negligent handling of the Damaged Rebar, Plaintiff has and continues to accrue monetary damages.

### Missing Bundle

49.

On or around July 11, 2025, Defendant's traffic manager informed Plaintiff's Vice President of Distribution of Sales that one of Plaintiff's bundle of rebar had gone missing from Defendant's inventory (the "*Missing Bundle*").

50.

Because Defendant could not locate the Missing Bundle, Defendant loaded one of Plaintiff's trucks, which was making a delivery to a customer, one bundle short.

51.

Defendant's employees informed Plaintiff that they believed the Missing Bundle was inadvertently loaded onto another of Plaintiff's trucks making a separate delivery to a separate customer.

52.

However, Plaintiff's customer, who Defendant believes was inadvertently sent the Missing Bundle, informed Plaintiff that there was no additional bundle of rebar included in its delivery outside of the amount of rebar it ordered itself.

53.

To date, Defendant has not located or reimbursed Plaintiff for the Missing Bundle.

54.

Upon information and belief, the Missing Bundle was lost as the direct result of Defendant's negligent handling of Plaintiff's property and Defendant's inability and lack of capacity to properly receive, store, and handle Plaintiff's large cargo shipment.

55.

Due to Defendant's acts, Plaintiff has incurred losses relating to delays, replacement of inventory, increased shipping costs, and damage to customer relationships.

56.

Due to Defendant's acts, Plaintiff was forced to retain an attorney to protect its rights and interests.

## CLAIM ONE: BREACH OF CONTRACT

57.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

58.

Based on the January and/or May Term Sheets (collectively, the "***Term Sheets***") together with the T&Cs and Defendant's representation that it had capacity to handle Plaintiff's large cargo shipment, Defendant entered into a valid and enforceable contract with Plaintiff.

59.

Under the contract, Defendant owed Plaintiff an obligation to not damage or lose any of Plaintiff's rebar being stevedored and stored by Defendant.

60.

Also under the contract, Defendant owed Plaintiff an obligation to charge Plaintiff for services according to the rates included in the Term Sheets.

61.

Defendant breached that obligation by negligently handling the Damaged Rebar while being stevedored or stored.

62.

Defendant also breached its obligation by losing the Missing Bundle while being stevedored or stored.

63.

Defendant also breached its obligation by charging Plaintiff extracontractual charges not included in the Term Sheets, and refusing to release Plaintiff's rebar unless such charges were paid.

64.

Plaintiff has incurred both monetary damages and damages to customer relationships as a result of Defendant's breaches.

## CLAIM TWO: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

65.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

66.

In Louisiana, there is an implied covenant of good faith and fair dealing recognized in every contract.

67.

Based on the Term Sheets together with the T&Cs and Defendant's representation that it had capacity to handle Plaintiff's large cargo shipment, Defendant entered into a valid and enforceable contract with Plaintiff. Thus, Defendant owed Plaintiff a duty of good faith and fair dealing in its performance of the terms of the enforceable contract.

68.

Defendant breached the duty of good faith and fair dealing by charging extracontractual charges for dunnage, negligently handling and losing Plaintiff's rebar, and reneging on its commitment to allow Plaintiff to send fifteen trucks per day to its facility.

69.

Defendant's breach of the duty of good faith and fair dealing was in bad faith.

70.

Defendant's breach deprived Plaintiff of the benefit of the bargain under the contract.

71.

Plaintiff has incurred both monetary damages and damages to customer relationships as a result of Defendant's breaches.

## CLAIM THREE: VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LUPTA)

72.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

73.

Under LUPTA, a business practice is unfair when it offends public policy and is unethical, oppressive, unscrupulous, or substantially injurious to consumers.

74.

Defendant's practice of adding extracontractual charges not included in any prior agreement, refusing to release Plaintiff's property until such charges have been paid, promising that it had the capacity to properly handle Plaintiff's shipment when it knew, or should have

known, that it did not have such capacity, and retaliating against Plaintiff for disputing the Dunnage Charge, offends Louisiana public policy against deceitful and unfair contractual dealings.

75.

Defendant's practices are unethical, oppressive, unscrupulous, and are substantially injurious to customers in that it forces consumers to pay charges not disclosed in prior agreements, deprives consumers of their property, and retaliates against customers who enforce their legal rights.

76.

Plaintiff has incurred both monetary damages and damages to customer relationships as a result of Defendant's unfair and deceptive business practice.

## CLAIM FOUR: NEGLIGENCE

77.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

78.

In Louisiana, there is a general duty to not negligently cause damage to another's property. In addition, there is an overarching duty to not negligently deny property owners access to their property.

79.

Defendant owed Plaintiff a duty to not cause Plaintiff's property to be lost and/or damaged when under Defendant's care and a duty to not negligently deny Plaintiff access to its rebar.

80.

Defendant lost and damaged Plaintiff's rebar while the rebar was under Defendant's care. Defendant also denied Plaintiff access to its rebar by significantly decreasing the amount of trucks it was willing to receive from Plaintiff for pickup of rebar per day.

81.

Defendant's actions were both the cause in fact and legal cause of Plaintiff's rebar being lost and damaged. Defendant's actions were also both the cause in fact and legal cause of Plaintiff being denied access to its rebar.

82.

Plaintiff has incurred both monetary damages and damages to customer relationships as a result of Defendant's negligence.

## CLAIM FIVE: PROMISSORY ESTOPPEL

83.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

84.

Defendant represented that it had the capacity and ability to handle Plaintiff's full shipment of rebar and that it was committed to allowing Plaintiff to send fifteen trucks per day to Defendant's facility to pick up rebar for delivery to customers.

85.

Plaintiff justifiably relied on Defendant's representation, as Plaintiff redirected its full shipment of rebar to Defendant's port and scheduled and organized deliveries to customers based on their ability to send fifteen trucks per day to Defendant's facility to pick up rebar.

86.

Because of Defendant's inability to handle Plaintiff's full shipment of rebar, Defendant changed its position on allowing fifteen trucks per day to Plaintiff's detriment.

87.

Plaintiff has incurred both monetary damages and damages to customer relationships as a result of Defendant's change in position.

## CLAIM SIX: FRAUD AND FRAUDULENT CONCEALMENT

88.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

89.

Defendant knowingly made a false representation that it could properly receive, store, and handle Plaintiff's large shipment of rebar and that it can receive fifteen of Plaintiff's trucks per day.

90.

Defendant omitted its intention to include the Dunnage Charge, without Plaintiff's consent, in Plaintiff's Stargazer Invoice.

91.

Defendant also omitted its intention to limit the number of Plaintiff's truck it was willing to receive per day after assuring Plaintiff that it was willing to receive fifteen trucks.

92.

Defendant omitted its intention to include the Dunnage Charge to obtain an unjust advantage over Plaintiff. Specifically, Defendant used the Dunnage Charge to deny Plaintiff of its possessory rights over the MV stargazer rebar unless Plaintiff made a payment to Defendants.

93.

Defendant omitted its intention to limit the amount of trucks it was willing to receive from Plaintiff per day in order to gain the ability to unfairly retaliate against Plaintiff in regard to disputing the Dunnage Charge.

94.

Plaintiff would not have agreed to Defendant's services if Defendant had been honest about its inability to handle Plaintiff's large shipment of rebar, initially disclosed its intention to include a mandatory charge for dunnage or that Defendant would unilaterally decrease the amount of trucks Plaintiff could send per day.

95.

Plaintiff has incurred both monetary damages and damages to customer relationships as a result of Defendant's intentional omissions.

## DAMAGES

96.

Plaintiff repeats, realleges, and incorporates by this reference the allegations hereinabove inclusively as though set forth at length and in full herein.

97.

Defendant's tortious acts have caused Plaintiff to incur expenses in extracontractual charges, loss of sales, damage to customer relationships, monetary damages due to delays in shipment, and replacement costs.

98.

Plaintiff's damages, taken together, collectively are in excess of $75,000.00.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1.

Defendant be duly served with this Complaint and summons, and commanded to respond according to the requirements of the Federal Rules of Civil Procedure.

2.

After due process and legal proceedings, judgment is rendered in favor of Plaintiff and against Defendant for all damages resulting from the matters described herein, including damages for general, special, and exemplary damages, in such amount as will be proven at trial, plus interest, reasonable costs and reasonable attorney fees.

3.

For all other such relief in which Plaintiff is entitled and that this Court deems fit and proper.

DATED October 1, 2025

RESPECTUFLLY SUBMITTED:

**SPENCER FANE LLP**


*/s/ R. Harold McCard, Jr.*
R. HAROLD MCCARD, JR. ESQ.
Louisiana Bar No. 027843
511 Union Street, Suite 1000
Nashville, TN 37219
Tele.: 615.248.4665

*Counsel for Intermetal Rebar, LLC*